1   Clint  Carmichael,
2   12602 North 189th Circle
3   Bennington, NE 68007
4   Phone: 858 217 3384

*FILED*
*U.S. DISTRICT COURT*
*DISTRICT OF NEBRASKA*

*10 JUN -1  PH 4: 35*

*OFFICE OF THE CLERK*

5           UNITED STATES DISTRICT COURT
6                DISTRICT OF NEBRASKA

| **Clint  Carmichael** | Case # 8:10cv212 |
|---|---|
| Plaintiff, | |
| vs. | **ORIGINAL PETITION AND** |
| **J P MORGAN CHASE** | **PETITION FOR RESTRAINING** |
| **270 PARK AVE** | **ORDER** |
| **NEW YORK, NY 10017** | |
| Defendant | |

7

8                            Date: 6/1/10

9   Comes now   Clint Carmichael, hereinafter referred to as "Petitioner," and moves

10  the court for relief as herein requested:

11                          **PARTIES**

12  Petitioner is    Clint Carmichael, 12602 North 189th Circle  Bennington, NE 68007.

13  Currently Known Defendant(s) are/is: JP Morgan Chase, 270 PARK AVE , NEW YORK, NY

14  80111, by and through its attorney, Steffi A. Swanson,  1902 Harlan Drive, Suite A, Bellevue NE

15  68005.

16                      **STATEMENT OF CAUSE**

17  Petitioner, on the 5th day of January, 2006, entered into a consumer contract for the refinance of a

18  primary residence located at  12602 North 189th Circle,   Bennington, NE  68007, hereinafter

19  referred to as the "property."

20  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

21  predatory loan agreement with Defendant.

22  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
23  crafted scheme intended to defraud Petitioner.

24  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
25  of the types of tactics used by Defendants to defraud Petitioner.

26  Defendants charged false fees to Petitioner at settlement.

27  Defendants used the above referenced false fees to compensate agents of Petitioner in order to
28  induce said agents to breach their fiduciary duty to Petitioner.

29  Defendant's attorney caused to be initiated collection procedures, knowing said collection
30  procedures in the instant action were frivolous as lender is estopped from collection procedures,
31  under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
32  the production of the original promissory note alleged to create a debt.

33                                    **IN BRIEF**
34                      *(Non-factual Statement of Posture and Position)*

35   It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
36  making a number of allegations that, outside the context of the current condition of the real
37  estate industry, may seem somewhat outrageous and counter-intuitive.

38  When Petitioner accuses ordinary individuals of acting in concert and collusion with an
39  ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
40  unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
41  people, just doing what they have been trained to do, are out to swindle the poor
42  unsuspecting borrower.

43  The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
44  committed by people acting in concert and collusion, one with the other.  Petitioner has no
45  reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
46  that what they were doing was part of an ongoing criminal conspiracy, only that it was,
47  and they, at the very least, kept themselves negligently uninformed of the wrongs they
48  were perpetrating.

49  Petitioner maintains that the real culprit is as much the system itself, including the courts,
50  for failure to strictly enforce the protections that remain in place in order to give lenders
51  good cause to exercise care in their dealings with unsuspecting consumers.
    ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          2 of 28

52    **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
53    *(General State of the Real Estate Industry)*

54    ***THE BEST OF INTENTIONS***

55    Prior to the 1980's and 1990's ample government protections were in place to protect the
56    consumer and the lending industry from precisely the disaster we now experience.
57    President Clinton's administration, under the guise of making housing available to the
58    poor, primary protections were relaxed which had the effect of releasing the money
59    changers on us all.

60    Under the pre-existing, carefully crafted monetary scheme, Lenders created loans then
61    they then stood the risk for said loan, and most Americans were, consequently, engaged in
62    safe and stable home mortgages.  With the protections removed, the money changers
63    swooped in and, instead of making loans available to the poor, they used the opportunity to
64    convince the unsophisticated American public to do something that had been essentially
65    taboo; they were convinced to speculate with their most important investment, their
66    homes.

67    JP Morgan Chase, Ameriquest, Country Wide, and many others swooped in and convinced
68    Americans to sell their homes, get out of the safe mortgage agreements, and speculate with
69    the equity by purchasing homes they could not afford.  Lenders created loans intended to
70    fail as, under the newly crafted system, the Lender profited more from a mortgage default
71    than from a stable loan.

72    Companies cropped up who called themselves banks when, in fact, they were only either
73    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
74    creating and selling promissory notes.  These companies then profited from the failure of
75    the underlying loans.

76    ***HOW IT WORKS***

77    Briefly, how it works is this, the Lender would secure a large loan from a large bank,
78    convert that loan into 20 and 30 year mortgages, then sell the promise to pay to an
79    investor.

80    An agent, usually a Agent, would contract with a seller to find a buyer, then bring both
81    seller and buyer to a lender who would secure the title from the seller using the funds
82    borrowed for that purpose then trade the title to the buyer in exchange for a promise to pay

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          3 of 28

83    a certain amount over a stipulated term. The lender, however, has created a 20 or 30 year
84    mortgage with money the lender must repay within 6 months, therefore, as soon as the
85    closing is consummated, the promissory note is pooled together with others and sold to an
86    investor.

87    Using the instant case as an example, a $744,800.00 note at 9.3680%  interest over 30
88    years will produce $2,250,057.82   The lender can then offer up the security at say 50% of
89    the future value to the investor.   The investor will, over the life of the note, less
90    approximately 3.00% servicing fees, realize $1,091,278.04 . The lender can then pay back
91    the bank and retain a handsome profit in the amount of $413,979.78. The lender, however,
92    is not done with the deal.

93    The lender signed over the promissory note to the investor at the time of the trade, did not
94    sign over the lien document. The State of Kansas Supreme Court addressed this issue and
95    stated that such a transaction was certainly legal, however, it created a fatal flaw in that,
96    the holder of the lien document, at time of sale of the security instrument, received
97    consideration in excess of the lien amount, and therefore, the lender could not be harmed
98    and the lien became a void document.

99    This begs a question, if keeping the lien would render it void, why would the lender not
100   simply transfer the lien with the promissory note?  As always, follow the money.  The
101   lender will hold the lien for three years, file an Internal Revenue Form 1099a, claim the
102   full amount of the lien as abandoned funds, and deduct the full amount from the lender's
103   tax liability. The lender, by this maneuver, gets consideration a second time and still the
104   lender is not done profiting from the deal.

105   After sale of the promissory note, the lender remains as the servicer for the investor.  The
106   lender will receive 3% of each payment the lender collects and renders to the investor
107   pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
108   that amount. Also, if the loan defaults, the lender stands to gain a considerable amount for
109   handling the foreclosure.

110   The lender stands to profit far more from a note that is overly expensive in the first
111   instance, then slow to pay in the second, then ultimately fails in the third, than from good
112   stable loan. And where, you may ask, does all this profit come from?  It comes from the
113   equity the lender convinced the borrower to invest in the new purchase, and still the lender
114   is not finished profiting from the deal.

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER     4 of 28

115  The last nail was driven in the American financial coffin on the last day of the Congress in
116  2000 when they removed a restriction that had been in place since the economic collapse
117  of 1907.  At that time, investors were allowed to bet on stocks without actually buying
118  them.  This unbridled speculation lead directly to an economic collapse so the legislature
119  banned the practice, until the year 2000.  The money changers got their way on the last
120  day, the last act of the session, when congress opened the process against and it took only
121  8 years to crash the stock market again.

122  The lender was not done profiting from the loan he created as he was then free to bet on
123  the failure of the security.

124  The unsuspecting consumer was lulled into accepting the pronouncements of the Agent
125  agents, the lenders, appraiser, underwriters, and trustees as all were acting under the cover
126  of government regulation.  Unfortunately, the regulations in place to protect the consumer
127  from just this kind of abuse were simply being ignored.

128  The loan origination fee from of the HUD1 settlement statement is the finder's fee paid for
129  the referral of the client to the lender by  a person acting as an agent for the borrower.
130  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
131  a commission of any kind consequent to securing the loan agreement through from the
132  borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
133  law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
134  seeking out a lender for the borrower, would seek the best deal for his client rather than
135  who would pay him the most.  That was the intent, but not the reality.  The reality is that
136  Agents never come away from the table with less than 2% or 3% of the principal.  This is
137  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
138  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
139  product that the borrower qualifies for.  This will generate more profits for the lender and,
140  consequently, for the Agent.

141  It was a common practice for lenders to coerce appraisers to give a higher appraisal than is
142  the fair market price.  This allows the lender to increase the cost of the loan product and
143  give the impression that the borrower is justified in making the purchase.

144  The lender then charges the borrower an underwriting fee in order to convince the
145  borrower that someone with knowledge has gone over the conditions of the note and
146  certified that the meet all legal criteria.

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          5 of 28

147    The entire loan process is a carefully contrive connivance designed and intended to induce
148    the unsophisticated borrower into accepting a loan product that is beyond the borrowers
149    means.

150    The trustee, at closing, participates actively in the deception of the borrower by placing
151    undue stress on the borrower to sign the large stack of paperwork without reading it. The
152    trustee is, after all, to be trusted and has been paid to insure the transaction. This trust is
153    systematically violated for the purpose of taking unfair advantage of the borrower.

154    With all this, it should be a surprise to no one that this country is having a real estate crisis.

155                           **PETITIONER WILL PROVE THE FOLLOWING**

156    Petitioner is prepared to prove, by a preponderance of evidence that:

157    Lender has no legal standing to bring collection or foreclosure claims against the property;

158    Lender is not a real party in interest in any contract which can claim a collateral interest in
159    the property;

160    even if Lender were to prove up a contract to which Lender had standing to enforce against
161    Petitioner, no valid lien exists which would give Lender a claim against the property;

162    even if Lender were to prove up a contract to which Lender had standing to enforce against
163    Petitioner, said contract was fraudulent in its creation as endorsement was secured by acts
164    of negligence, common law fraud, fraud by non-disclosure, fraud in the inducement, fraud
165    in the execution, usury, and breaches of contractual and fiduciary obligations by
166    Mortgagee or "Trustee" on the Deed of Trust, "Mortgage Agents," "Loan Originators,"
167    "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or officers of
168    Structured Investment Vehicle," "Investment Banker," "Trustee of Special Purpose
169    Vehicle/Issuer of Certificates of 'Asset-Backed Certificates,'" "Seller of 'Asset-Backed'
170    Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of certain
171    mortgage loans pooled together in a trust fund;

172    Defendants have concocted a carefully crafted connivance wherein Lender conspired with
173    Agents, et al, to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff
174    to enter into a predatory loan inflated loan product;

175    Lender received unjust enrichment in the amount of 5% of each payment made late to
176    Lender while Lender and Lender's assigns acted as servicer of the note;

177   Lender and Lender's assigns, who acted as servicer in place Lender, profited by handling
178   the foreclosure process on a contract Lender designed to default;

179   Lender intended to defraud Investor by converting the promissory note into a security
180   instrument and selling same to Investor;

181   Lender intended to defraud Investor and the taxpayers of the United States by withholding
182   the lien document from the sale of the promissory note in order that Lender could then
183   hold the lien for three years, then prepare and file Internal Revenue Form 1099a and
184   falsely claim the full lien amount as abandoned funds and deduct same from Lender's
185   income tax obligation;

186   Lender defrauded backers of derivatives by betting on the failure of the promissory note
187   the lender designed to default;

188   Participant Defendants, et al, in the securitization scheme described herein have devised
189   business plans to reap millions of dollars in profits at the expense of Petitioner and others
190   similarly situated.

191                          **PETITIONER SEEKS REMEDY**

192   In addition to seeking compensatory, consequential and other damages, Petitioner seeks
193   declaratory relief as to what (if any) party, entity or individual or group thereof is the
194   owner of the promissory note executed at the time of the loan closing, and whether the
195   Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
196   Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
197   alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

198   ***PETITIONER HAS BEEN HARMED***

199   Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

200   Such harm and detriment includes economic and non-economic damages, and injuries to
201   Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

202   In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
203   equitable relief requested herein is granted.

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        7 of 28

204                          **STATEMENT OF CLAIM**

205          ***DEFENDANTS  LACKS STANDING***

206          **No evidence of Contractual Obligation**

207     Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
208     produce said contract.  Even if Defendants produced evidence of the existence of said contract in
209     the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
210     that a contract actually existed at one point in time.  A copy, considering the present state of
211     technology, could be easily altered.  As Lender only created one original and that original was
212     left in the custody of Lender, it was imperative that Lender protect said instrument.

213     In as much as the Lender is required to present the original on demand of Petitioner, there can be
214     no presumption of regularity when the original is not so produced.   In as much as Lender has
215     refused Petitioner's request of the chain of custody of the security instrument in question by
216     refusing to identify all current and past real parties in interest, there is no way to follow said
217     chain of custody to insure, by verified testimony, that no alterations to the original provisions in
218     the contract have been made.   Therefore, the alleged copy of the original is only hearsay
219     evidence that an original document at one time existed.  Petitioner maintains that, absent
220     production of admissible evidence of a contractual obligation on the part of Petitioner,
221     Defendants are without standing to invoke the subject matter jurisdiction of the court.

222          **No Proper Evidence of Agency**

223     Defendants claim agency to represent the principal in a contractual agreement involving
224     Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
225     pronouncement that agency has been assigned by some person, the true identity and capacity of
226     whom has not been established.  Defendants can hardly claim to be agents of a principal then
227     refuse to identify said principal.  All claims of agency are made from the mouth of the agent with
228     no attempt to provide admissible evidence from the principal.

229     Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
230     court.

231    **Special Purpose Vehicle**

232    Since the entity now claiming agency to represent the holder of the security instrument is not the
233    original lender, Petitioner has reason to believe that the promissory note, upon consummation of
234    the contract, was converted to a security and sold into a special purpose vehicle and now resides
235    in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue
236    Code and as such, cannot be removed from the REMIC as such would be a prohibited
237    transaction.    If the mortgage was part of a special purpose vehicle and was removed on
238    consideration of foreclosure, the real party in interest would necessarily be the trustee of the
239    special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a
240    special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
241    cause to believe defendant is not the proper agent of the real party in interest.

242    *CRIMINAL CONSPIRACY AND THEFT*

243    Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
244    a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
245    negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
246    acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
247    Petitioner by Lender, which were then used to fund the improper payment of commission fees to
248    Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

249    *AGENT PRACTICED UP-SELLING*

250    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
251    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
252    that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
253    Agent's conspiratorial relationship to Lender,    Agent violated Agent's fiduciary duty to
254    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
255    connivances, wherein Agent proactively made knowingly false and misleading statements of
256    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
257    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
258    a loan product offered by the Lender.  Said loan product was more expensive than Petitioner
259    could legally afford. Agent acted with full knowledge that Petitioner would have made a
260    different decision had Agent given complete disclosure.

261    *FRAUDULENT INDUCEMENT*

262    Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
263    known, Petitioner could not afford in order to unjustly enrich Lender.

264    *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

265    Said more expensive loan product was calculated to produce a higher return when sold as a
266    security to an investor who was already waiting to purchase the loan as soon as it could be
267    consummated.

268    **Extra Commission for Late Payments**

269    Lender acted with deliberate malice in order to induce Petitioner into entering a loan agreement
270    that Lender intend Petitioner would have difficulty paying.  The industry standard payment to the
271    servicer for servicing mortgage note is 3% of the amount collected.  However, if the borrower is
272    late on payments, a 5% late fee is added and this fee is retained by the servicer.  Thereby, the
273    Lender stands to receive more than double the regular commission on collections if the borrower
274    pays late.

275    **Extra Income for Handling Foreclosure**

276    Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
277    on which Lender intend petitioner to default on.

278    In case of default, the Lender, acting as servicer, receives considerable funds for handling and
279    executing the foreclosure process.

280    **Credit Fault Swap Gambling**

281    Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
282    fault swap derivatives.  Since Lender designed the loan to fail, betting on said failure is
283    essentially a sure thing.

284    *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

285    Lender sold the security instrument immediately after closing and received consideration in an
286    amount in excess of the lien held by Lender.

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          10 of 28

287  Since Lender retained the lien document upon the sale of the security instrument, Lender
288  separated the lien from said security instrument, creating a fatal and irreparable flaw.

289  When Lender received consideration while still holding the lien and said consideration was in
290  excess of the amount of the lien, Lender was in a position such that he could not be harmed and
291  could not gain standing to enforce the lien. The lien was, thereby, rendered void.

292  Since the separation of the lien from the security instrument creates such a considerable concern,
293  said separation certainly begs a question: "Why would the Lender retain the lien when selling the
294  security instrument?"

295  When you follow the money the answer is clear. The Lender will hold the lien for three years,
296  then file and IRS Form 1099a and claim the full amount of the lien as abandoned funds and
297  deduct the full amount from Lender's tax liability, thereby, receiving consideration a second
298  time.

299  Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
300  lien to the holder of the security, however, the lien once satisfied, does not gain authority just
301  because the holder, after receiving consideration, decides to transfer it to someone else.

302  ***LENDER PROFIT BY CREDIT FAULT SWAP DERIVATIVES***

303  Lender further stood to profit by credit fault swaps in the derivatives market, by way of inside
304  information that Lender had as a result of creating the faulty loans sure to default. Lender was
305  then free to invest on the bet that said loan would default and stood to receive unjust enrichment
306  a third time. This credit default swap derivative market scheme is almost totally responsible for
307  the stock market disaster we now experience as it was responsible for the stock market crash in
308  1907.

309  ***TRUTH IN LENDING STATEMENT VARIANCES***

310  The lender defrauded Petitioner by claiming a fraudulent payment amount not consistent with the
311  provisions of the contract entered into by Petitioner. If Petitioner paid the amount specified by
312  the Truth in Lending Statement, instead of the amount agreed to in the promissory note created
313  by Petitioner, Lender would have defrauded Petitioner of an amount equal to $1,112,451.91.

314     ***LENDER CHARGED FALSE FEES***

315     Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real

316     Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party

317     vendor.

318     Lender charged other fees that were a normal part of doing business and should have been

319     included in the finance charge.

320     Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time

321     did Lender or Trustee provide documentation to show that the fees herein listed were valid,

322     necessary, reasonable, and proper to charge Petitioner.

| | |
|---|---|
| 803Appraisal Fee to Robert Nebe | $350.00 |
| 806 LBMC Underwriting Fee to Long Beach Mortgage Company | $549.00 |
| 807Tax Research/Payment Fee to WAMU | $38.00 |
| 808 Tax Procurement/Tracking Fee to LandAmerica | $43.00 |
| 809 Flood Certificate to LandAmerica | $13.00 |
| 810 Mortgage Broker Fee to Mortgage Express | $7,488.00 |
| 811 Processing Fee to Mortgage Express | $200.00 |
| 812 Broker Underwriting fee to Mortgage Express | $400.00 |
| 813 Broker Credit Report to Mortgage Express | $15.00 |
| 820 Premium Yield Adjustment to Mortgage Express by LBMC $7448.00 POCL | $7,448.00 |
| 901 Interest from 1/13/2006 to 2/1/2006 @ $155.08 per diem | $2,946.52 |
| 1101 Settlement/ Closing Fee to Midlands Land Title & Abstract, Inc. | $150.00 |
| 1105 Documentation Preparation to Long Beach Mortgage Company | $250.00 |
| 1108 Title Insurance to Midlands Land Title &Abstract, Inc. | $1,178.00 |
| 1113 1118. Overnight Courier Fee to Midlands Land Title & Abstract, Inc. | $100.00 |
| 1201 Recording Fees:  Deed = ; Mortgage(s) = $100.50; Release(s) = | $100.50 |

323     Debtor is unable to determine whether or not the above fees are valid in accordance with the

324     restrictions provided by the various consumer protection laws.  Therefore, please provide; a

325     complete billing from each vendor who provided the above listed services; the complete contact

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          12 of 28

326    information for each vendor who provided a billed service; clearly stipulate as to the specific
327    service performed; a showing that said service was necessary; a showing that the cost of said
328    service is reasonable; a showing of why said service is not a regular cost of doing business that
329    should rightly be included in the finance charge.

330    The above charges are hereby disputed and deemed unreasonable until such time as said charges
331    have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
332    restrictions included in any and all laws, rules, and regulations intended to protect the consumer

333    .

334    In the event lender fails to properly document the above charges, borrower will consider same as
335    false charges. The effect of the above amounts that borrower would pay over the life of the note
336    will be an overpayment of $906,697.14. This amount will be reduced by the amount of items
337    above when said items are fully documented.

338    ***RESPA PENALTY***

339    From a cursory examination of the records, with the few available, the apparent RESPA
340    violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
341    Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
342    presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
343    No 1st Payment Letter.

344    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
345    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
346    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
347    disclosure letter; loan discount fee disclosure; business insurance company arrangement
348    disclosure; notice of right to rescind.

349    The courts have held that the borrower does not have to show harm to claim a violation of the
350    Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
351    in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
352    no more than two thousand, considering the large number enumerated here, it is reasonable to
353    consider that the court will assess the maximum amount for each violation.

354    Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
355    the note, borrower has calculated that, the number of violations found in a cursory examination

356    of the note, if deducted from the principal, would result in an overpayment on the part of the
357    borrower, over the life of the note, of $947,049.34.

358    If the violation penalty amounts for each of the unsupported fees listed above are included, the
359    amount by which the borrower would be defrauded is $961,670.48

360    Adding in RESPA penalites for all the unsupported settlement fees along with the TILA/Note
361    variance, it appears that lender intended to defraud borrower in the amount of $3,927,868.87.

362    ***LENDER CONSPIRED WITH APPRAISER***

363    Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
364    purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
365    duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
366    inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
367    Petitioner.

368    ***LENDER CONSPIRED WITH TRUSTEE***

369    Lender conspired with the trust Agent at closing to create a condition of stress for the specific
370    purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
371    fully understand what was being signed.

372    The above referenced closing procedure was a carefully crafted connivance, designed and
373    intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
374    to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
375    did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
376    as required by various consumer protection statutes.

377    ***DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES***

378    In the manner in which Defendants have carried on their business enterprises, they have engaged
379    in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
380    (Deceptive Practices Act).

381    Such conduct comprises a pattern of business activity within the meaning of such statutes, and
382    has directly and proximately caused Petitioner to suffer economic and non-economic harm and
383    detriment in an amount to be shown according to proof at trial of this matter.

384    *EQUITABLE TOLLING FOR TILA AND RESPA*

385    The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
386    Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

387    Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
388    *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
389    are subject to a one-year limitations period; however, such claims are subject to the equitable
390    tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
391    subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
392    that given the remedial purpose of TILA, the limitations period should run from the date of
393    consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
394    circumstances, suspend the limitations period until the borrower discovers or has reasonable
395    opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
396    *v. California, 784 F.2d 910, 915 9th Cir. 1986).*

397    Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
398    anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
399    that such limitations period may be equitably tolled. The Court of Appeals for the District of
400    Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
401    *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
402    opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
403    *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
404    that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
405    *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
406    *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
407    interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
408    language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
409    of precedential value, this Court has previously found both the TILA and **RESPA** limitations
410    periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
411    *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

412    The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
413    by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
414    existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*

415   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
416   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
417   any wrongful conduct by the Defendants. Santa Maria. at 1178.

418   ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
419   ### *STANDARDS*

420   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
421   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
422   evidencing title, employment information, and other information and documentation that could
423   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
424   ability to repay a particular loan over both the short and long term. Defendants deviated from and
425   disregarded these standards, particularly with regard to its riskier and more profitable loan
426   products.

427   **Low-Documentation/No-Documentation Loans.**

428   Driven by its desire for market share and a perceived need to maintain competitiveness with the
429   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
430   documentation loan products, including the HARMs and HELOCs described hereinabove, and
431   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
432   the already eased underwriting standards to the point of disregarding such standards. This
433   quickened the loan origination process, allowing for the generation of more and more loans
434   which could then be resold and/or securitized in the secondary market.

435   Defendants marketed no-documentation/low-documentation loan programs that included
436   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
437   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
438   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
439   was to be roughly consistent with incomes in the types of jobs in which the borrower was
440   employed. When borrowers were requested to document their income, they were able to do so
441   through information that was less reliable than in a full-documentation loan.

442   For stated income loans, it became standard practice for loan processors, loan officers and
443   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
444   income loans, emphasizing loan origination from a profitability standpoint at the expense of

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        16 of 28

445  determining the ability of the borrower to repay the loan from an underwriting standpoint,
446  encouraged the overstating and/or fabrication of income.

### Easing of Underwriting Standards

448  In order to produce more loans that could be resold/securitized in the secondary mortgage
449  market, Defendants also relaxed, and often disregarded, traditional underwriting standards used
450  to separate acceptable from unacceptable risk. Examples of such relaxed standards was reducing
451  the base FICO score needed for a SISA loan.

452  Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
453  used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
454  loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
455  income ratios (the amount of monthly income compared to monthly debt service payments and
456  other monthly payment obligations.

457  With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
458  term financial circumstances,  approving the loan based on the initial fixed rate without taking
459  into account whether the borrower could afford the substantially higher payment that would
460  inevitably be required during the remaining term of the loan.

461  With respect to HELOCs, Defendants underwrote and approved such loans based only on the
462  borrower's ability to afford the interest-only payment during the initial draw period of the loan,
463  rather than on the borrower's ability to. afford the subsequent, fully amortized principal and
464  interest payments.

465  As Defendants pushed to expand market share, they eased other basic underwriting standards.
466  For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
467  allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. In each case, the higher the
468  ratio the greater the risk that the borrower will default.

469  Defendants knew, or in the exercise of reasonable care should have known, from its own
470  underwriting guidelines industry standards that it was accumulating and selling/reselling risky
471  loans that were likely to end up in default. However, as the pressure mounted to increase market
472  share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
473  underwriting guidelines. Such was the environment that loan officers and underwriters were,

474   from time to time, placed in the position of having to justify why they did not approve a loan that
475   failed to meet underwriting criteria.

476   **Risk Layering**

477   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
478   loans with one or more relaxed underwriting standards.

479   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
480   would increase the likelihood of default. Among the risk layering Defendants engaged in were
481   approving HARM loans with little to no down payment, little to no documentation, and high
482   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
483   the loans it promoted to borrowers.

484   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
485   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
486   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
487   business ignored basic established underwriting standards and acted to mislead the borrower, all
488   to the detriment of the borrower and the consumer of loan products..

489   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
490   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
491   business practices described above in paragraphs 30-42 of this Complaint

492   *UNJUST ENRICHMENT*

493   Petitioner is informed and believes that each and all of the Defendants received a benefit at
494   Petitioner's expense, including but not limited to the following: To the Agent, commissions,
495   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
496   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
497   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
498   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
499   percentages of payment proceeds, charges, and other "back end" payments in amounts to be
500   proved at trial; To all participants, the expectation of future revenues from charges, penalties and
501   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

502   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
503   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
504   deprived, and is entitled to restitution in the amount of $3,927,868.87.

505   ***CLAIM TO QUIET TITLE.***

506   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
507   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
508   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
509   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

510   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
511   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
512   interest in the Subject Property has been rendered void and that the Defendants are not the holder
513   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
514   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

515   "a Petitioner is entitled to damages from those Defendants who concur in the tortious
516   scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
517   *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
518   *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
519   *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
520   *Rptr. 2d 752 (2d Dist. 1995).*

521   ***SUFFICIENCY OF PLEADING***

522   Petitioner has sufficiently pled that relief can be granted on each and every one of the
523   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
524   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
525   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
526   allegations of material fact in the complaint are taken as true and construed in the light most
527   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

528   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
529   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
530   theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
531   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        19 of 28

532  conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
533  should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
534  Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
535  their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
536  relief as requested herein should be granted.

537  <center>**CAUSES OF ACTION**</center>

538  ***BREACH OF FIDUCIARY DUTY***

539  Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
540  duty of care with respect to the mortgage loan transactions and related title activities involving
541  the Trust Property.

542  Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
543  breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
544  all applicable laws governing the loan transactions in which they were involved, including but
545  not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

546  Defendant's breaches of said duties was a direct and proximate cause of economic and non-
547  economic harm and detriment to Petitioner(s).

548  Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
549  all to be shown according to proof at trial of this matter.

550  ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

551  Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
552  duty to properly perform due diligence as to the loans and related transactional issues described
553  hereinabove.

554  In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
555  X and Z promulgated there under to, among other things, provide proper disclosures concerning
556  the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
557  or should have known that borrowers could  not afford or maintain, and to avoid paying undue
558  compensation such as "yield spread premiums" to mortgage Agents and loan officers.

559  Defendants knew or in the exercise of reasonable care should have known, that the loan
560  transactions involving Petitioner and other persons similarly situated were defective, unlawful,
561  violative of federal and state laws and regulations, and would subject Petitioner to economic and
562  non-economic harm and other detriment.

563  Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
564  Z promulgated there under were intended and designed to protect, and the conduct alleged
565  against Defendants is the type of conduct and harm which the referenced statutes and regulations
566  were designed to deter.

567  As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
568  non-economic harm in an amount to be shown according to proof at trial.

569  *AGENT: COMMON LAW FRAUD*

570  If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
571  negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
572  ground for believing them to be true.

573  Agents made these representations with the intention of inducing Petitioner to act in reliance on
574  these representations in the manner hereafter alleged, or with the expectation that Petitioner
575  would so act.

576  Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
577  in their negligent misrepresentation, and that various Agents were negligent in not implementing
578  procedures such as underwriting standards oversight that would have prevented various Agents
579  from facilitating the irresponsible and wrongful misrepresentations of various Agents  to
580  Defendants .

581  Petitioner is informed and believes that Agent acted in concert along with other others named
582  herein in promulgating false representations to cause Petitioner to enter into the LOAN without
583  knowledge or understanding of the terms thereof.

584  As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
585  Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
586  opportunities, attorney fees and costs, and other damages to be determined at trial. As a
587  proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        21 of 28

588   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
589   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
590   at trial.

591   *PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED*
592   *COVENANT OF GOOD FAITH AND FAIR DEALING.*

593   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
594   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
595   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
596   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
597   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
598   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

599   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
600   particular significance, in part because of the special relationship between the insurer and the
601   insured. The insurer, when determining whether to settle a claim, must give at least as much
602   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
603   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

604   Likewise, there is a special relationship between a Agent and borrower. "A person who provides
605   Agentage services to a borrower in a covered loan transaction by soliciting Lenders or otherwise
606   negotiating a consumer loan secured by real property, is the fiduciary of the consumer...this
607   fiduciary duty [is owed] to the consumer regardless of whom else the Agent may be acting as an
608   Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in *good faith.* If the
609   *Agent knew or should have known that the Borrower will or has a likelihood of defaulting ... they*
610   *have a fiduciary duty to the borrower not* to place them in that loan." (California Department of
611   Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov). [*Emphasis Added*].

612   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
613   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
614   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
615   product without regard for other more affordable products; (4) Placed Petitioner into a loan
616   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
617   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
618   valid and /or properly documented substitutions and assignments so that Petitioner could

712  Clint  Carmichael,
713  12602 North 189th Circle
714  Bennington, NE  68007
715  Phone: 858 217 3384

716                    **UNITED STATES DISTRICT COURT**
717                         **DISTRICT OF NEBRASKA**

**Clint  Carmichael**                           Case # _____

Plaintiff,

vs.                                              **ORDER**

**J P MORGAN CHASE**
**270 PARK AVE**
**NEW YORK, NY 10017**

Defendant

718  _____

719          After considering Petitioner's application for temporary restraining order, the pleadings,
720  the affidavits, and arguments of counsel, the court finds there is evidence that harm is imminent
721  to Petitioner, and if the court does not issue the temporary restraining order, Petitioner will be
722  irreparably  injured  because  Petitioner's  application  is  not  granted,  harm  is  imminent  and
723  irreparable if Defendants are allowed to proceed with foreclosure, Defendants will foreclose and
724  liquidate Petitioner's primary residence and leave Petitioner with no home. Petitioner has no
725  place to move or reside due to the cost of litigation and financial distress caused in part by the
726  fraud of Defendants pleadings here. There is no adequate remedy at law to calculate damages to
727  Petitioner if Petitioner is removed from residence and made homeless.

728          Therefore, the court orders the following:
729          JP Morgan Chase, by and through it's attorney, Steffi A. Swanson,  1902 Harlan Drive,
730  Suite A, Bellevue,  NE 68005, is restrained from further proceedings on the issue of foreclosure
731  for which there is a challenge to the standing of Defendants to prosecute foreclosure.

732  The clerk is ordered to issue notice to Defendant,  by and through its attorney, Steffi A.
733  Swanson, 1902 Harlan Drive, Suite A, Bellevue NE 68005, that the hearing on Petitioner's
734  application for temporary injunction is set for _____, 20___, at _____ a.m./p.m.  The
735  purpose of the hearing shall be to determine whether this temporary restraining order should be
736  made a temporary injunction pending a full trial on the merits.
ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          27 of 28

619   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
620   request for documentation of the servicing of Petitioner's loan and the existence and content of
621   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
622   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
623   right under an alleged power of sale because the purported assignment was not recorded and by
624   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
625   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
626   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

627   *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
628   *SEQ*

629   Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
630   contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
631   Action as though the same were set forth herein.

632   This consumer credit transaction was subject to the Petitioner's right of rescission as described
633   by *15 U.S.C. § 1635*(a) and Regulation Z § 226.23 (12 C.F.R. § 226.23).

634   More particularly, the same Defendants violated *15 U.S.C. § 1635*(a) and Regulation Z §
635   226.23(b) with regards to the purported Notice of Right to Cancel. As a consequence of this
636   action, the Notice of Right to Cancel documentation was not provided to Petitioner or if
637   furnished, to Petitioner it failed to: Correctly identify the transaction, Clearly and conspicuously
638   disclose the Petitioner's right to rescind the transaction three days after delivery of all required
639   disclosures, Clearly and conspicuously disclose how to exercise the right to rescind the
640   transaction, with a form for that purpose, Clearly and conspicuously disclose the effects of
641   rescission, Clearly and conspicuously disclose the date the rescission period expired.

642   Petitioner is informed and believes that Defendants's violation of the provisions of law rendered
643   the credit transaction null and void, invalidates Defendants's claimed interest in the Subject
644   Property, and entitles Petitioner to damages as proven at trial.

645   *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

646   The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
647   highly leveraged and vulnerable consumers who placed their faith and trust in the superior

689
690

691

692

693                            **VERIFICATION**

694

695

696   I, Clint  Carmichael, do swear and affirm that all statements made herein are true and accurate,
697   in all respects, to the best of my knowledge.

698
699    Clint  Carmichael,
700   12602 North 189th Circle
701   Bennington, NE  68007
702   Phone: 858 217 3384
703

704   SWORN  TO  AND  SUBSCRIBED  BEFORE  ME, __                      ___, by ____
705   _____, on the _____ day of _____, 2010, which witnesses my hand and seal of office.

706

707                          _____

708                          **NOTARY PUBLIC IN AND FOR**

709                          **THE STATE OF NEBRASKA**

710

711

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        26 of 28

648   knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
649   civilized society.

650   Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
651   distress, or acted in conscious and/or reckless disregard of the probability that such distress
652   would occur.

653   Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
654   conduct of Defendants as described hereinabove.

655   As a result of such severe emotional distress, Petitioner suffered economic and non economic
656   harm and detriment, all to be shown according to proof at trial of this matter.

657   Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
658   Petitioner and secure to Petitioner quite title;

659   Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
660   as payments to Defendants based on the fraudulently secured promissory note in an amount to be
661   calculated by Defendants and verified to Petitioner;

662   Petitioner further demands that Defendants pay to Petitioner an amount equal to trebel the
663   amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
664   equal to $1,034,131.35

665                                                    **PRAYER**
666   WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
667   as follows:

668          For an emergency restraining order enjoining lender and any successor in interest from
669          foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
670          herein;

671          For a permanent injunction enjoining Defendants from engaging in the fraudulent,
672          deceptive, predatory and negligent acts and practices alleged herein;

673          For quiet title to Property;

674          For rescission of the loan contract and restitution by Defendants to Petitioner according
675          to proof at trial;

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        24 of 28

676  For disgorgement of all amounts wrongfully acquired by Defendants according to proof
677  at trial;

678  For actual monetary damages in the amount of $3,927,868.87;

679  For pain and suffering due to extreme mental anguish in an amount to be determined at
680  trial.

681  For pre-judgment and post-judgment interest according to proof at trial;

682  For punitive damages according to proof at trial in an amount equal to $11,783,606.61;

683  For attorney's fees and costs as provided by statute; and,

684  For such other relief as the Court deems just and proper.

685  **Respectfully Submitted,**
686
687
688  **Clint Carmichael**

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          25 of 28

689
690

691

692

693                               **VERIFICATION**

694

695

696     I, Clint  Carmichael, do swear and affirm that all statements made herein are true and accurate,
697     in all respects, to the best of my knowledge.

698
699      Clint  Carmichael,
700     12602 North 189th Circle
701     Bennington, NE  68007
702     Phone: 858 217 3384
703

704     SWORN TO AND SUBSCRIBED BEFORE ME, ~mindi Laaker~ by Clint Carmichael
705     _____, on the  /  day of  Vure  , 2010, which witnesses my hand and seal of office.

706

707                            mindi Laaker

708                  **NOTARY PUBLIC IN AND FOR**

709                  **THE STATE OF NEBRASKA**

710

711